IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
September 9, 2014 Session

## STATE OF TENNESSEE v. DANDARIUS WOODS

**Appeal from the Criminal Court for Davidson County**
**No. 2013-A-620     Monte Watkins, Judge**

_____

## No. M2014-00194-CCA-R9-CD - Filed October 31, 2014

_____

Defendant, Dandarius Woods, was charged with one count of aggravated rape and one count of rape. He filed a motion to suppress a statement that he made to police, alleging that his statements were coerced by implied promises of leniency. After a hearing, the trial court granted the motion, finding that Defendant's statements were not voluntary. The State sought an interlocutory appeal. Upon thorough review of the record, we find that the detective did not imply that Defendant would be released or that Defendant would receive treatment in lieu of a jail sentence if he confessed to rape. Therefore, we reverse the decision of the trial court and remand the case for further proceedings.

### Tenn. R. App. P. 9 Interlocutory Appeal;
### Judgment of the Criminal Court Reversed and Remanded

TIMOTHY L. EASTER, J., delivered the opinion of the Court, in which JAMES CURWOOD WITT, JR. and D. KELLY THOMAS, JJ., joined.

Robert E. Cooper, Jr., Attorney General and Reporter; Clark B. Thornton, Senior Counsel; Victor S. Johnson III, District Attorney General; and Hugh Ammerman, Assistant District Attorney General, for the appellant, State of Tennessee.

Dawn Deaner, District Public Defender; Jeffrey A. DeVasher, Assistant Public Defender (on appeal); and Jason Sexton, Assistant Public Defender (at hearing), Nashville, Tennessee, for the appellee, Dandarius Woods.

**OPINION**

*Factual and Procedural Background*

On March 8, 2013, the Davidson County Grand Jury indicted Defendant on one count of aggravated rape and one count of rape.[1] The Defendant filed a motion to suppress the statement he made to police. A hearing was held on March 11, 2013, where the following proof was adduced:

On April 23, 2012, Detective John Farrell of the Metro Nashville Police Department was assigned to investigate a rape allegation against Defendant. A warrant had been issued for Defendant's arrest, alleging that he raped his cousin two days earlier. Detective Farrell arrested the eighteen-year-old Defendant and placed him in handcuffs. Detective Farrell was not wearing a police uniform, but he identified himself as a police officer and showed Defendant his gun and his badge. Detective Farrell interviewed Defendant in the front seat of his unmarked police car, which was parked in the driveway of Defendant's residence. The interview was audio-recorded. The recording, which also includes discussions with Defendant's family both before and after the interview, is approximately forty-six minutes long.

The recorded statement as well as a transcript were entered into evidence. In the recording, Detective Farrell explained to Defendant and his family members that he would be taking Defendant to the hospital to have his blood drawn for a required "AIDS" test. Defendant would then be taken to booking where, after a few hours, his family could try to make bond. Detective Farrell explained that Defendant would not be released without a bond. Detective Farrell allowed Defendant's mother to provide him with food and drink during the interview, and Detective Farrell moved Defendant's handcuffs to the front so that he could eat.

Detective Farrell read a *Miranda* rights waiver form to Defendant. Defendant indicated that he understood his rights and signed the form. Detective Farrell testified at the hearing that he did not see any indication that Defendant was intoxicated, overly tired, or mentally ill at the time of the interview. Detective Farrell told Defendant, "what the warrant is for is for rape," and encouraged him that the best thing to do would be to tell the truth. Detective Farrell said, "I can tell when somebody is not being truthful."

Defendant stated that he and his cousin were in the basement together, that he was asleep on the couch and she was coming and going. He admitted that they had smoked some marijuana earlier. He said that he was awakened when she called her mother. He said when

---

[1]This indictment superseded an earlier indictment charging Defendant with two counts of rape.

his mother and grandmother came downstairs for her, she started crying, and he did not know why. He stated that he loved his cousin like a sister and that he would not touch her. He denied that they had any kind of disagreement that night and stated, "We were cool."

Detective Farrell told Defendant that his cousin was at the hospital for a "rape kit" and that they were collecting other evidence as well. Detective Farrell explained his theory of what happened: that Defendant's hormones got the better of him, things got out of control, and he made a mistake. Detective Farrell explained that at eighteen, you tend to act before you think. Then he said, "[Y]ou know, if that's the case, I mean, we can get through this. I mean, we can make it [past] this, okay. I mean, that's why I'm here talking to you."

Defendant agreed that it was a fair statement that "things happened before you could think." Detective Farrell asked Defendant if he was hitting on his cousin and things got out of control. Defendant stated that he blacked out and did not remember. When Detective Farrell asked if he remembered his cousin having a screwdriver and telling him to back off, Defendant answered, "I ain't gonna lie. I probably do remember that." He then stated, "I'd be feeling so high cause that's just not me, man." Detective Farrell again told Defendant that it was a mistake and reassured him that he was not a bad person.

Defendant asked, "So if I get charged with this I'm going to have to do some years?" Detective Farrell responded, "Not necessarily, not necessarily. . . .This right here is, is the beginning of . . . a process." When Detective Farrell asked Defendant if he regretted what he did, Defendant responded, "Yes sir."

Detective Farrell reiterated that he wanted Defendant to tell the truth. He said:

[T]he truth at this point is going to go a long way, okay, a long way. Uh, and I think you understand that, okay, I. . . I . . . I . . . deep down I think you know that by telling the truth that's only going to help you, not hurt you, okay. Uh, you know, I mean you've heard the phrase the truth will set you free. I mean it's true and, and let me tell you when I, when I talk, you know, a lot of people every time when people tell me the truth and tell me, yeah, this is what happened. I'm telling you one hundred percent, every one of them says, you know what I feel better for telling the truth. Not only mentally it's the right thing to do but physically it feels like that weight that's on your shoulder right now, it's just gone.

Detective Farrell suggested that Defendant went over to his cousin and started kissing her. Defendant responded, "I guess, that's what they say I did." When Detective Farrell showed some disagreement, Defendant stated, "Yeah, okay. I'm laying on the couch. I went

-3-

over there and kissed her." Defendant agreed with Detective Farrell that he pulled off her pants and panties. He agreed that he was getting excited. But when Detective Farrell asked if he put his penis in her vagina, Defendant stated, "Not my cousin, man. . . Not my cousin. I didn't do that. . . I just can't, man. This didn't happen."

Defendant said that he knew that Detective Farrell was trying to help him. Then the following exchange took place:

Defendant:     What I'm saying if I go along saying I did this. What will happen to me?

Detective:     If what?

Defendant:     If I go along saying that I did this what will happen, like? I'm gonna do some time regardless.

Detective:     What? Now, well. . . Listen to me.

Defendant:     Some time or what?

Detective:     Well, listen to me.

Defendant:     Is I'm going to get help or?

Detective:     I can't speak. Absolutely you're going to get help, cause listen to me first of all, you're saying if you go along with it. I don't want you to go along with anything. I want you to tell the truth about what happened, okay. I . . . I don't want you to feel that, that you're just saying what I want to hear, cause that's not what I want you to do. I want you to say what happened, okay. Not, not what you think I want to hear, okay. But let me tell you doing time or, or, or, or, or, uh, getting sentenced or whatever that's a long ways off, okay. And I'm not going to sit here and tell you that you're not going to do time. And I'm not going to sit here and tell you that you are going to do time, okay. At this point, man . . . we're, we're way in the beginning here, okay. Where you get some help and some counseling . . . I can almost guarantee that, okay. I can almost guarantee it, okay. You're eighteen, you're a young guy, you know . . . you're the type of person that our society wants to help and, and get help so this

-4-

doesn't happen again.

Detective Farrell explained that Defendant was the type of person society wants to see rehabilitated: someone young and remorseful, as opposed to an older person with a significant arrest record and no remorse for his actions. Defendant agreed that he had been arrested only twice as a juvenile on minor charges. Detective Farrell said that Defendant was a "good guy" who "screwed up" and "made a mistake." Defendant then repeated, "I made a mistake." Defendant responded affirmatively when the detective asked if he was "sorry for what happened last night," if he regrets "that [he] did that," and if he "wished it had never happened."

The following exchange then took place:

Detective:     [L]et me ask you just a couple of things, okay. Let's just get this out in the open, okay. This. . . this did happen, right?

Defendant:     Yeah.

Detective:     Yeah. I mean you forced her to have sex with you.

Defendant:     I didn't force her.

Detective:     Well, you held her, you held her arms down, right? Cause she's got some scratches on her wrist and on her arm, okay.

Defendant:     I didn't hold her arms down.

Detective:     I can't hear you.

Defendant:     I didn't hold her arms down.

Detective:     You didn't hold her arms down. But you were on top of her and she couldn't get up, right? Is that right? I can't hear you.

Defendant:     Yes Sir.

Defendant told Detective Farrell that he did not ejaculate and that he did not wear a condom. Detective Farrell then said, "But you obviously knew at some point she didn't want that to happen, right? Yeah, you're shaking your head, okay, okay." Detective Farrell explained at the hearing that Defendant was shaking his head up and down affirmatively.

At that point, Detective Farrell concluded the interview, and he and Defendant exited the vehicle. Defendant's family members asked if he did it or if he was just saying that he did it. Defendant responded, "Yeah, I'm saying I did it, momma," adding, "I did it. I'm saying I did it."

Detective Farrell explained to Defendant's family that Defendant is a good kid who made a mistake and that Defendant wants to get help. Detective Farrell said, "I know nothing I can say is gonna, kind of make this go away. But I . . . hope it helps that he's been very cooperative with me." The recording ends as Detective Farrell is leaving with Defendant.

On cross-examination, Detective Farrell acknowledged that he tried to gain Defendant's trust as an interview technique. He also agreed that the issue of Defendant's receiving treatment came up several times during the interview. He explained on re-direct examination that, to his understanding, sex offender treatment would be mandated as part of a conviction.

Defendant was prepared to testify at the hearing and agreed that the subject of treatment came up during the interview. However, the State objected that Defendant's testimony could open the door to extensive cross examination. The trial court stated, "I think I can take from the interviews what his intentions are."

On June 20, 2013, the trial court issued an order granting Defendant's motion.[2] The trial court made the following findings of fact and conclusions of law:

> In the instant case, the [D]efendant was 18 years old at the time of the interview. Detective Farrell arrived at the [D]efendant's home, handcuffed the [D]efendant, told him that there was a warrant for his arrest and that he would have to take him to the hospital to get blood drawn because of the nature of the warrant and that it had "nothing to do with the case." During the course of the interview, Detective Farrell gave the impression to the [D]efendant that he was there to help him by repeatedly indicating to the [D]efendant that he believed that he had made a mistake because of his age and that he would get treatment.

> The Court heard arguments of respective counsel, listened to testimony of Detective Farrell, the recorded interview and reviewed the transcript and relevant case law. Applying the above legal standard, the Court finds after

---

[2]The trial court filed an amended order on June 26, 2013, correcting the case number to reflect the superseding indictment. In all other respects, the two orders are identical.

review of the challenged statement under the totality of the circumstances that the [D]efendant's statements were "compelled" as a result of psychological coercion and were induced by an implied promise of leniency, however, slight. In viewing the totality of the circumstances surrounding the interrogation, the Court finds that there were repeated statements by the detective that the [D]efendant was going to get help if he acknowledged wrong doing. The Court finds that these statements were implied promises of leniency. Therefore, the Court finds that the [D]efendant's statements were involuntary, a product of coercion and are not admissible.[3]

The State sought permission from the trial court to file an interlocutory appeal pursuant to Rule 9 of the Tennessee Rules of Appellate Procedure, which was granted on July 15, 2013. On January 30, 2014, the State filed a motion with this Court to accept its late-filed application for permission to appeal. This Court granted the State's motion on April 2, 2014. On May 8, 2014, we granted the State's application for interlocutory appeal under Rule 9 of the Tennessee Rules of Appellant Procedure.

*Analysis*

In reviewing a motion to suppress, this Court will uphold the trial court's findings of fact unless the evidence preponderates otherwise. *State v. Hayes*, 188 S.W.3d 505, 510 (Tenn. 2006) (citing *State v. Odom*, 928 S.W.2d 18, 23 (Tenn.1996)). Questions concerning the "credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." *Odom*, 928 S.W.2d at 23. The party prevailing in the trial court is afforded "the strongest legitimate view of the evidence and all reasonable and legitimate inferences that may be drawn from that evidence." *State v. Keith*, 978 S.W.2d 861, 864 (Tenn. 1998). However, when the findings of fact are based entirely on evidence that does not involve issues of witness credibility, "appellate courts are as capable as trial courts of reviewing the evidence and drawing conclusions[,] and the trial court's findings of fact are subject to de novo review." *State v. Berios*, 235 S.W.3d 99, 104 (Tenn. 2007) (citing *State v. Binette*, 33 S.W.3d 215, 217 (Tenn.2000)). Additionally, our review of the trial court's application of the law to the facts is de novo, with no presumption of correctness. *State v. Walton*, 41 S.W.3d 75, 81 (Tenn. 2001) (citing *State v. Crutcher*, 989 S.W.2d 295, 299 (Tenn.1999); *State v. Yeargan*, 958

---

[3]On March 5, 2013, Defendant filed an addendum to his motion, seeking to suppress a second interview between Defendant and Detective Farrell that took place on April 25, 2012. However, even though a recording of the second interview was entered into evidence and testimony about it was solicited at the hearing, the trial court's order addresses only the interview from April 23.

S.W.2d 626, 629 (Tenn.1997)).

The Fifth Amendment to the United States Constitution guarantees that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." Article I, section 9 of the Tennessee Constitution similarly provides that "in all criminal prosecutions, the accused . . . shall not be compelled to give evidence against himself." The test for voluntariness under the Tennessee Constitution is broader and more protective of individual rights than under the Fifth Amendment. *State v. Smith*, 933 S.W.2d 450, 455 (Tenn. 1996).

Statements made during the course of a custodial police interrogation are inadmissible at trial unless the State establishes that the defendant was advised of his right to remain silent and his right to counsel and that the defendant then waived those rights. *Miranda v. Arizona*, 384 U.S. 436, 471-75 (1966); *see also Dickerson v. United States*, 530 U.S. 428, 444 (2000); *Stansbury v. California*, 511 U.S. 318, 322 (1994). A defendant's rights to counsel and against self-incrimination may be waived as long as the waiver is made voluntarily, knowingly, and intelligently. *Miranda*, 384 U.S. at 478; *State v. Middlebrooks*, 840 S.W.2d 317, 326 (Tenn. 1992). In this case, Defendant does not dispute that he made a voluntary, knowing, and intelligent wavier of his rights to counsel and against self-incrimination during the interview with Detective Farrell. Instead, Defendant argues that the statements he made during his custodial interrogations were involuntary because they were the product of psychological coercion.

The voluntariness of a confession "remains distinct from *Miranda*." *State v. Climer*, 400 S.W.3d 537, 567 (Tenn. 2013) (citing *Dickerson*, 530 U.S. at 434-35). Because "coerced confessions are inherently unreliable," only voluntary confessions may be admitted as evidence. *Id*. (citing *Dickerson*, 530 U.S. at 433). It has long been held that for a statement to be voluntary, it "must not be extracted by any sort of threats or violence, nor obtained by any direct or implied promises, however slight, nor by the exertion of any improper influence." *State v. Kelly*, 603 S.W.2d 726, 727 (Tenn. 1980) (quoting *Bram v. United States*, 168 U.S. 532, 542-43 (1897)). "A defendant's subjective perception alone is not sufficient to justify a conclusion of involuntariness in the constitutional sense." *Smith*, 933 S.W.2d at 455. Rather, "coercive police activity is a necessary predicate to finding that a confession is not voluntary." *Id*. (quoting *State v. Brimmer*, 876 S.W.2d 75, 79 (Tenn. 1994)); *see also State v. Downey*, 259 S.W.3d 723, 733 (Tenn. 2008) ("for a confession to be involuntary, it must be the product of coercive state action").

However, "[p]romises of leniency by state officers do not render subsequent confessions involuntary *per se*: 'The Fifth Amendment does not condemn all promise-induced admissions and confessions; it condemns only those which are *compelled* by promises of leniency.'" *Smith*, 933 S.W.2d at 455 (emphasis in original) (quoting *Kelly*, 603

S.W.2d at 729). The determinative question is "whether the behavior of the State's law enforcement officials was such as to overbear [the defendant's] will to resist and bring about confessions not freely self-determined." *Kelly*, 603 S.W.2d at 728 (quoting *Rogers v. Richmond*, 365 U.S. 534, 544 (1961)); *see also Climer*, 400 S.W.3d at 568 ("[T]he essential inquiry under the voluntariness test is whether a suspect's will was overborne so as to render the confession a product of coercion.") (citing *Dickerson*, 530 U.S. at 433-35; *Smith*, 933 S.W.2d at 455).

In order to determine the voluntariness of a statement, a court must "examine the totality of the circumstances surrounding the giving of a confession, 'both the characteristics of the accused and the details of the interrogation.'" *Climer*, 400 S.W.3d at 568 (quoting *Dickerson*, 530 U.S. at 434); *see also Monts v. State*, 400 S.W.2d 722, 733 (1966). Factors relevant to this determination include:

> [T]he age of the accused; his lack of education or his intelligence level; the extent of his previous experience with the police; the repeated and prolonged nature of the questioning; the length of the detention of the accused before he gave the statement in question; the lack of any advice to the accused of his constitutional rights; whether there was an unnecessary delay in bringing him before a magistrate before he gave the confession; whether the accused was injured[,] intoxicated[,] or drugged, or in ill health when he gave the statement; whether the accused was deprived of food, sleep[,] or medical attention; whether the accused was physically abused; and whether the suspect was threatened with abuse.

*Id.* (alterations in original) (quoting *State v. Huddleston*, 924 S.W.2d 666, 671 (Tenn. 1996)); *State v. Blackstock*, 19 S.W.3d 200, 208 (Tenn. 2000) (recognizing that no single factor is necessarily determinative).

In the present case, Defendant was eighteen years old at the time the interview in question took place. He had never been arrested as an adult, but he had been arrested as a juvenile on two or three occasions for minor offenses. Defendant was not in custody very long before the statement was made, and the entire recording of the interview was less than forty-five minutes in length. Defendant was read his *Miranda* rights and indicated that he understood them. Detective Farrell testified that there was no indication that Defendant was injured, intoxicated, overly tired, or mentally ill. Defendant was provided food during the interview. Defendant was not physically abused, nor threatened with any abuse.

Defendant argues that this case is analogous to *State v. Phillips*, 30 S.W.3d 372 (Tenn. Crim. App. 2000). In *Phillips*, the defendant was interviewed by two investigators with the

-9-

Department of Children's Services about allegations of sexual misconduct with his stepdaughters. *Id.* at 374. This Court affirmed the trial court's finding that the defendant's incriminating statement was involuntary based on the following factors: "(1) misrepresentations by an investigator [about having DNA evidence against the defendant], (2) numerous steadfast denials by the defendant, (3) statements that law enforcement officials would be involved if the defendant did not confess, and (4) promises of treatment for the defendant and his stepdaughter only if he fully confessed." *Id.* at 377.

However, this case is distinguishable from *Phillips*. In that case, charges had not been filed against the defendant, and the defendant was not in custody nor given any *Miranda* warnings. Therefore, it was reasonable for the defendant to believe the investigator's promise that law enforcement would not be involved if he confessed. In this case, law enforcement was already involved: Defendant was under arrest on a warrant for rape, he was sitting in an unmarked police car in handcuffs, and he was talking to a detective who had identified himself as a police officer by showing Defendant his badge and his gun. Detective Farrell read Defendant his *Miranda* rights and Defendant signed a waiver form. Defendant had been warned that anything he said could "be used against [him] in court." There is no indication that Defendant did not understand his rights. Additionally, Detective Farrell did not make any misrepresentations to Defendant about the evidence in the case. Therefore, the determining factor in this case is whether the discussion about Defendant receiving treatment, or "help," constituted a promise of leniency in exchange for a confession.

As this Court has held, "[o]ne of the main factors in determining whether promises of leniency compelled a suspect's confession is whether law enforcement officials or other State agents made specific promises of leniency (i.e., treatment or a reduced sentence) in return for the suspect's statements or threatened the suspect with prosecution (or a more severe sentence) should he not cooperate." *State v. Cyntoia Denise Brown*, M2007-00427-CCA-R3-CD, 2009 WL 1038275, at *21 (Tenn. Crim. App. Sept. 28, 2009). In that case, this Court found that the detective's generalized promises to tell the district attorney if the defendant cooperated did not render her statements involuntary. *Id.* at 22. In *State v. Weltha Womack*, on the other hand, this Court found that the defendant's incriminating statements were compelled by an implied promise of leniency when the detective stated that he wanted to "close it out" without "a court battle." No. E2003-02332-CCA-R3-CD, 2005 WL 17428, at *6 (Tenn. Crim. App. Jan. 4, 2005). Finally, in *State v. Terry McRee*, this Court found that while some of the statements made by the police "certainly hint that a confession could lead to leniency, less jail time, and possibly mental health treatment, there [was] simply no concrete 'promise' made." No. W2013-00194-CCA-R3-CD, 2014 WL 1168606, at *9 (Tenn. Crim. App. Mar. 21, 2014).

In the present case, the subject of treatment was first brought up by Defendant when

he asked, "If I go along saying that I did this . . . I'm gonna do some time regardless . . . [or] is I'm going to get help?" Detective Farrell responded that Defendant would "absolutely" get help, but he wanted Defendant to tell the truth about what happened rather than just "go along" with what he was saying. Detective Farrell explained that he could not say whether Defendant was "going to do time," but he could "almost guarantee" that Defendant would get counseling. Unlike the investigators in *Phillips*, Detective Farrell never said that Defendant would get counseling only if he confessed to rape. Additionally, Detective Farrell never made any threats that Defendant would receive a more severe sentence if he did not confess. Therefore, we cannot agree with the trial court's determination that "there were repeated statements by the detective that the [D]efendant was going to get help *if he acknowledged wrong doing*." (Emphasis added). Even though Detective Farrell was unequivocal that Defendant would receive treatment, he never stated that the availability of treatment was conditional on Defendant's confession, nor did he promise that if Defendant confessed, he would receive treatment in lieu of prosecution.

We also cannot agree with Defendant's assertion that Detective Farrell's statement "the truth will set you free" was an implied promise of leniency. When Detective Farrell made that statement, he explained to Defendant that he would feel better if he told the truth, that a weight would be lifted off of his shoulders, not that he would literally be free to go. In fact, Detective Farrell had already explained to Defendant and his family that Defendant would be taken to booking where he would not be released without his family making a bond.

Based on the totality of the circumstances, we cannot conclude that Defendant's will was overborne such that his statements were not freely self-determined. Even after Detective Farrell supposedly promised leniency and treatment if Defendant confessed, Defendant continued to deny that he raped his cousin. Initially, he denied any sexual contact with his cousin. Then he claimed that he did not remember, but admitted remembering that she threatened him with a screw driver if he did not back off. Then he admitted kissing her and taking off her pants and panties but denied having intercourse. Finally, he admitted that "this did happen" but denied that he forced her to have sex or that he held her arms down. Therefore, even if we were to find that Detective Farrell did make promises of leniency, we see no evidence that Defendant's will to resist was overborne. Also, we point out Defendant did not testify in the hearing, and consequently, the trial court's determinations are not predicated upon a finding about Defendant's credibility.

*CONCLUSION*

Upon thorough review of the record, we find that Defendant's statement to Detective Farrell on April 23 was not compelled by implied promises of leniency. We find that his

-11-

statement was voluntary under the totality of the circumstances. We, therefore, reverse the ruling of the trial court and remand this matter for further proceedings.


_____
TIMOTHY L. EASTER, JUDGE